AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

for the
Eastern District of Missouri

JAN **1 3** 2016

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| In the Matter of the Search of )<br>the single room storage locker designated as )<br>43E/E043 located at Public Storage at 3192 South )<br>Brentwood, Webster Groves, Missouri, which has an )<br>off white corrugated metal door within a controlled )<br>access building, with the numbers 43E posted to left )<br>side of the door to the storage unit. ) | Case No. 4:16 MJ 7036 (SPM) |

## APPLICATION FOR A SEARCH WARRANT

I,  Brandon Burke , a federal law enforcement officer or an attorney for the government request
a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**the single room storage locker designated as 43E/E043 located at Public Storage at 3192 South Brentwood, Webster Groves, Missouri, which has an off white corrugated metal door within a controlled access building, with the numbers 43E posted to left side of the door to the storage unit,**

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

### SEE ATTACHED LIST

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 846, 841(a)(1) | Conspiracy to possess with intent to distribute controlled substance(s) |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

- ✓ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

BRANDON BURKE, Special Agent
Federal Bureau of Investigation

*Printed name and title*

Sworn to before me and signed in my presence.

Date:. _____January 13, 2016_____

*Judge's signature*

City and State:  St. Louis, MO

Hon. Shirley P. Mensah U.S. Magistrate Judge
*Printed name and title*
AUSA:   MICHAEL A. REILLY

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Brandon E. Burke, a Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that:

I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

I have been a Special Agent with the FBI for approximately eight years; and I am currently assigned to the St. Louis Division. Prior to my employment with the FBI, I was an officer in the United States Army. I have received training at the FBI Academy in Quantico, Virginia, in criminal and national security investigative techniques. During my eight years as a Special Agent, I have participated in numerous drug and gang investigations, and have been a part of an investigative team that has been involved in the investigation of drug trafficking and money laundering. I have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover employees, the execution of search warrants, debriefings of confidential witnesses, and reviews of taped conversations and drug records. I have been the Affiant for numerous search warrant and Title III wire and electronic intercept affidavits.

This Affidavit is submitted in support of an application for the issuance of a search warrant for the premises at the following location: A single room storage locker 43E/E043 located at Public Storage at 3192 South Brentwood, Webster Groves, Missouri, 63119, which has an off white corrugated metal door within a controlled access building, with the numbers 43E posted to left side of the door to the storage unit (hereinafter referred to as the **"subject**

1

location"),  which is located within the Eastern District of Missouri. It is my opinion and the opinion of the investigative team as experienced, trained narcotics investigators, that after certain prerequisite circumstances are met there will be probable cause to believe that evidence will be found in violation(s) of:  Title 21, U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute narcotics and conspiracy to distribute narcotics), 843(b) (unlawful use of a communications facility to distribute controlled substances), and 848 (continuing criminal enterprise);  Title 18, U.S.C. §§ 922 and 924(c) and (j) (felon in possession of firearms, ammunition, and possession of firearms in furtherance of drug distribution related murder, and possession of firearms in furtherance of drug trafficking crimes); and related narcotics-based financial crimes including violation(s) of Title 18, U.S.C., §§ 1956 (money laundering and conspiracy to commit money laundering) and 1957 (monetary transactions in criminally-derived property).  The violations have been committed by persons known and as yet unknown to the investigators.

The facts and information set forth in the Affidavit are based upon my personal knowledge obtained during the course of the investigation, information reported to me by other agents and employees of the FBI and other law enforcement agencies, my review of reports, toll analysis, pen register analysis, interception of wire and electronic communications, financial analysis, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of securing a search and seizure warrant, it does not include each and every fact known to me concerning this investigation, and sets forth only those facts believed necessary to establish probable cause that violations of Title 21, U.S.C. §§ 841(a)(1), 846, 843(b), 848, and 18 U.S.C. §§ 922(g), 924(c) and (j), and 1956 and 1957 have occurred, are occurring, and will occur.

### RELIABILITY OF INFORMATION

2

This investigation has developed three cooperating witnesses ("CW-1, CW-2, and CW-3") that have provided significant information relating to the facts contained herein. Regarding CW-1, in late August 2014 and again in December 2014, CW-1 implicated and identified Jose Alfredo VELAZQUEZ as a major Mexican cocaine trafficker responsible for the importation of kilograms of cocaine from Mexico to various United States cities, which include St. Louis, Memphis, Dallas, Atlanta, Cincinnati, and New York City. CW-1 told investigators that he/she was part of this expansive cocaine distribution organization. CW-1 explained that VELAZQUEZ organized bulk shipments of cocaine to these cities, which resulted in the routine delivery of multiple kilograms of cocaine to an individual in St. Louis by the name of "AD." CW-1 met with "AD" on numerous occasions and was aware that "AD" received multiple kilogram shipments of cocaine. CW-1 positively identified "AD" as Adrian LEMONS ("LEMONS") (by photograph) as receiving bulk cocaine shipments from VELAZQUEZ and providing payment for the cocaine with bulk United States currency (USC) proceeds as payment. CW-1 also positively identified LEMONS and VELAZQUEZ's voice over court authorized wire intercepts.

In 2014, CW-1 was arrested by investigators and determined to be in possession of multiple kilograms of cocaine, a firearm, and bulk United States currency. CW-1 has a significant criminal history of felony convictions and is offering assistance in the hopes of obtaining judicial consideration. CW-1's information regarding LEMONS has been corroborated through other sources of information, such as physical surveillance, search warrant, and electronic surveillance, including judicially authorized Title III intercepts, and enforcement operations. For example, CW-1 accurately described the light blue BMW car that LEMONS used to pick-up a shipment(s) of cocaine. The investigative team has observed LEMONS operating this vehicle.

3

Regarding CW-2, law enforcement officials received detailed information beginning in the summer of 2015 from CW-2 concerning LEMONS' drug distribution operations. CW-2 is presently charged in a federal indictment and is offering assistance in the hopes of obtaining judicial consideration. CW-2 has provided information related to the drug distribution activities and related violent crimes of LEMONS and his associates. CW-2 has been determined to be reliable based upon physical surveillance, interviews of others sources and/or witnesses, the execution of search warrants, and the existing overall investigation. CW-2 has previously pled guilty to a drug distribution related felony offense in state court.

By way of summary only, CW-2 described his/her relationship with LEMONS during which time he/she purchased kilogram amounts of cocaine from LEMONS and personally observed LEMONS sell kilograms of cocaine to other subjects of this investigation.  CW-2 identified 8546 Concord Place  and 8573 North Broadway as locations where LEMONS provided cocaine to CW-2. CW-2 has also provided information about homicides conducted by Anthony JORDAN, aka "TT," and others.  As referenced below, JORDAN is supplied cocaine by LEMONS.

Regarding CW-3, law enforcement officials received detailed information beginning in January 2016 from CW-3 concerning LEMONS' drug distribution operations and related violence. CW-3 is cooperating in the hopes of obtaining judicial consideration. CW-3 has previously been convicted of multiple felony offenses, including at least one felony offense related to drug distribution.

The information CW-3 has provided has proved to be reliable based upon physical surveillance, interviews of others sources and/or witnesses, police reports, and electronic surveillance. By way of summary only, CW-3 described his/her relationship with LEMONS

4

during which he/she purchased cocaine from LEMONS at 8546 Concord Place and 8573 North Broadway.

Lastly, this affidavit contains information provided by confidential law enforcement sources. These sources may be referred to in the masculine form. This reference is for convenience, and is not necessarily an identification of the true gender of any source.

## SUPERSEDING INDICTMENT PENDING

On January 7, 2016, 19 individuals, including LEMONS and VELAZQUEZ were federally indicted by a Grand Jury in the Eastern District of Missouri in two indictments, including a superseding indictment in cause number S1-4:15CR 00404 HEA (NAB), in which 18 defendants were indicted on a total of twenty counts.  The superseding indictment has been unsealed, many arrest warrants have been executed, however some warrants have not yet been executed.  LEMONS and VELAZQUEZ have been charged in Count One of the superseding indictment as principals in a continuing criminal enterprise in violation of Title 21, United States Code, § 848.  LEMONS has also been charged with a drug related homicide and violations of Title 18, United States Code, §§ 924(c) and (j). A total of 15 defendants, including LEMONS and VELAZQUEZ have been indicted in Count Three of the indictment for conspiracy to distribute cocaine in violation of Title 21, United States Code,  §§ 841(a)(1) and 846. Dwayne RAINEY, referred to herein, has also been indicted in Count Three for conspiracy to distribute cocaine.[1] Anthony JORDAN, aka "TT," one of LEMONS' top customers/distributors has also been charged with conspiracy to distribute cocaine and multiple firearms violations for Title 18, United States Code, §§ 924(c) and (j), death resulting.

---

[1]   Other individuals referred to herein who have been indicted in Count Three, conspiracy to distribute and possess with the intent to distribute cocaine, include the following:  Juan Ramon Garza, Louis Fernando Cantu, Laron Coleman, Louis Felton, Clarence Miller, and Demetrius O'Neal.

5

## LOCATION TO BE SEARCHED

The Affiant is requesting a search warrant for the **subject location** as described below and as detailed herein:

A single room storage locker 43E/E043 located at Public Storage at 3192 South Brentwood, Webster Groves, Missouri, 63119, which has an off white corrugated metal door within a controlled access building, with the numbers 43E posted to left side of the door to the storage unit

## FACTS ESTABLISHING PROBABLE CAUSE

This investigation into the LEMONS Criminal Enterprise ("CE") encompasses the activities of LEMONS' operations since approximately 2012 to the present. This investigation has revealed that LEMONS is the leader of a significant CE in St. Louis responsible for the importation and distribution of well over hundreds of kilograms of cocaine.[2] Investigators identified Jose Alfredo VELAZQUEZ, based in Reynosa, Mexico, as LEMONS' cocaine supplier. Investigators have executed numerous judicially authorized wiretaps targeting LEMONS, Laron COLEMAN, a cocaine distributor for LEMONS, and VELAZQUEZ, LEMONS' cocaine supplier. The details set forth below are a summary of the significant aspects of this investigation, which describes LEMONS' CE's modus operandi. Throughout the investigation, LEMONS used multiple locations to store and distribute narcotics and proceeds from drug trafficking. Further, investigators believe evidence pertaining to this long-term drug conspiracy will be found in the location to be searched. These locations are key strategic places for the LEMONS' CE.

---

[2] A review of **LEMONS'** criminal history revealed numerous drug and weapon related arrests including a felony conviction in 2005 for distribution, delivery and manufacturing of a controlled substance, for which he was sentenced to seven (7) years confinement in Missouri Department of Corrections.

## THE STORAGE LOCKER

On January 12, 2016, the Honorable Shirley P. Mensah issued a search warrant (4:16MJ 7002) for 11553 Poggemoeller Avenue, St. Louis, Missouri 63138, the primary residence of LEMONS. On January 13, 2016, during the morning hours, agents executed the search warrant at which time investigtors located LEMONS, who was arrested in relation to the indictment referred to herein, and Britteny Spencer.

Agents executed the search warrant and recovered evidence including but not limited to the following:  (1) two safes in a crawl space in the basement, one of which contained a large amount of United States currency, which agents believe to be drug proceeds; (2) a loaded .40 caliber pistol; (3) suspected drug distribution notes; and (4) a hand written note including the following language:  "Public Storage (314) 968-2551 3192 S. Brentwood  1025 #125682697 (Chris)."

Agents know that Spencer is associated with LEMONS because she has rented vehicles in her name which LEMONS was observed driving during the course of the investigation.  As set forth herein, investigators are also aware that Spencer traveled to Mexico with LEMONS in or about August 2015, as set forth herein, at page 20.

During the execution of the search warrant, agents located a slip of paper with the address of the Public Storage facility.  I am aware that drug dealers maintain stash houses and may utilize storage facilities to store illegal narcotics, drug distribution records, United States currency, and other contraband.  I am also aware that the LEMONS CE, in this case, operated multiple stash locations, including some in the names of other persons.  In view of all the circumstances, the investigative team believes the storage locker named herein is being used to hide store illegal narcotics, drug distribution records, United States currency, and other contraband.

Agents contacted Public Storage employees and determined that Britteny Spencer contracted with Public Storage beginning on August 20, 2015 to maintain the single unit storage locker described herein. Employees from Public Storage advised agents that the access code for unit 43E/E043 was utilized on January 6 and January 7, 2016, to gain access to the storage locker. Agents also learned that Spencer did not pay her bill in December, and Public Storage employees removed her lock and placed a Public Storage lock on the unit. During late December 2015, an individual who identified herself as Ms. Spencer contacted employees at Public Storage, paid her late bill, and expressed her concern that the employees may have been in her locker or had discarded her items in storage. Thereafter, Public Storage employees removed the lock which they installed and provided a new lock to Ms. Spencer. Agents have confirmed that the individual who identified herself as Britteny Spencer provided correct identifying information to employees at Public Storage.

## COURT AUTHORIZED INTERCEPTS

On August 4, 2014, United States District Judge for the Eastern District of Missouri, Rodney W. Sippel, in cause number 4:14MC00420RWS, issued an order that authorized the interception of wire and electronic communications of (314) 201-4902 (target telephone 2), used by Laron COLEMAN, and his cocaine supplier, LEMONS, using (314) 477-8998 (target telephone 3). Interceptions commenced on August 4, 2014 and ceased on September 2, 2014. On October 16, 2014, United States District Judge for the Eastern District of Missouri, Audrey G. Fleissig, in cause number 4:14MC00420RWS, issued an order that authorized the renewed interception of wire and electronic communications of (314) 477-8998 (target telephone 3), used by LEMONS. Interceptions pursuant to 4:14MC00420RWS ceased at 11:59 p.m., on November 15, 2014. On November 21, 2014, United States District Judge for the Eastern District of

8

Missouri, John A. Ross, in cause number 4:14MC000420RWS, issued an order that authorized the renewed interception of wire and electronic communications of (314) 477-8998 and (314) 363-7152 (target telephone 4), both used by LEMONS. Interceptions pursuant to 4:14MC00420RWS ceased at 11:59 p.m., on December 20, 2014. On February 3, 2015, United States District Judge for the Eastern District of Missouri, Carol E. Jackson, in cause number 4:15MC00049CEJ, issued an order that authorized the interception of wire and electronic communications of (314) 817-4376 (target telephone 5), used by Adrian LEMONS. Interceptions commenced on February 4, 2015 and ceased on February 6, 2015.

On April 21, 2015, a court authorized wire intercept, issued in the Eastern District of Virginia, was executed over Mexican base telephone number 52-8993146435 (target telephone 6) believed to be used by Jose Alfredo VELAZQUEZ. On or about May 20, 2015, the District Court for the Eastern District of Virginia issued an order authorizing the renewed interception of wire communications of target telephone 6. On or about June 19, 2015, the District Court for the Eastern District of Virginia issued an order authorizing the renewed interception of wire communications of target telephone 6. Interceptions over target telephone 6 ceased on July 18, 2015.

## CASE BACKGROUND

The investigation has revealed that LEMONS is a large scale cocaine dealer that investigators believe historically has trafficked hundreds of kilograms of cocaine to the Eastern District of Missouri from the country of Mexico. Further, LEMONS is part of a violent criminal organization led in part by Anthony JORDAN, aka "TT." The scope of the conspiracy is evident from the fact that the investigative team has seized approximately $1,000,000.00 in United States currency during the course of a single week of enforcement operations. According to interviews

with related witnesses and sources of information, investigators believe the LEMONS Criminal Enterprise has generated drug proceeds in well in excess of $9,000,000.00 since 2012 within the Eastern District of Missouri. Investigators, based upon their training and experience, view this as an exceptionally large and sophisticated drug trafficking organization. Investigators have also twice seized drug trafficking ledgers/notes during the course of enforcement operations in August 2014 and February 2015.

## FEBRUARY 2014 HSI OPERATION AND SEIZURES

On February 3, 2014, the Homeland Security Investigation ('HSI') McAllen, Texas furthered an independent investigation into the tractor-trailer shipment of bulk quantities of cocaine destined for the United States; specifically, investigators in southern Texas seized approximately 30 kilograms of cocaine destined for St. Louis, Missouri.

On February 6, 2014, HSI and DEA St. Louis Divisions conducted enforcement operations related to the seized cocaine, feigning delivery to a member of the organization responsible for the St. Louis, Missouri distribution point. During the operations, agents seized approximately $138,000 in United States currency; and in this, there were two bundles of currency labeled "38" (believed by investigators to be $38,000.00), and "42" (believed by investigators to be $42,000.00). Subsequent to the successful feigned delivery of imitation cocaine, investigators executed a search warrant at 7230 North Broadway and recovered items including approximately 17 kilograms of cocaine, a money counter, a vacuum sealer, vacuum bags, and a Ruger .40 caliber pistol. Investigators later developed CW-1. CW-1 advised that "AD" (LEMONS) would obtain monthly shipments of cocaine, ranging from 30 to 75 kilograms per shipment, delivered from tractor-trailer combination vehicles. CW-1 further advised this cocaine distribution network was organized by VELAZQUEZ. CW-1 explained that LEMONS

10

used the property at 7230 Broadway as a location where drug shipments could be dropped off and where LEMONS would take control of them.  7230 Broadway was also used as a stash house for money.  CW-1 explained that VELAZQUEZ shipped approximately 300 kilograms of cocaine to LEMONS in 2013.  Later, CW-2, independent of information developed from CW-1, advised investigators that LEMONS admitted losing approximately 45 kilograms of cocaine in relation to these events.  CW-2 further explained that "the Mexican," (VELAZQUEZ) promised and delivered 100 kilograms to LEMONS after the seizure in early February 2014.

### INVESTIGATION BETWEEN FEBRUARY AND NOVEMBER 2014

The investigative team developed information that led to the above mentioned period of Title III intercepts targeting LEMONS in August 2014. The following information is offered as brief illustrations of some of the investigation of the LEMONS Criminal Enterprise. Investigators conducted a comprehensive investigation that at times included the use of surveillance during periods of intercepts, which ultimately led the recovery of the first set of drug ledgers in this investigation.

On August 25, 2014, investigators believe that RAINEY met with LEMONS at a stash house located at 7118 Idlewild, St. Louis, Missouri, to purchase drugs following intercepted communications between them. The same day, a marked St. Louis County Police Department (SLCPD) car executed a vehicle stop of RAINEY in his 2009 black Chevrolet truck following his departure from LEMONS at 7118 Idlewild within the Eastern District of Missouri. When approaching RAINEY to obtain identification and insurance information, the SLCPD officer observed a black bag in the passenger seat of the truck. During the course of the traffic stop, the officer returned to his vehicle, and shortly thereafter re-approached RAINEY's vehicle. Before the officer could make contact with RAINEY, RAINEY fled away at a high rate of speed and

succeeded in evading arrest at that time.  The abandoned truck was located shortly thereafter and was subsequently impounded by SLCPD; the black bag previously observed by the SLCPD officer who made the initial stop was missing.   Intercepted communications revealed that RAINEY, using (314) 201-5449, called LEMONS on target telephone 3 and said, "Boys (police) jumped on me as soon as I left (7118 Idlewild Avenue)." LEMONS asked RAINEY, "You make it out?" RAINEY replied, "I had to throw." Investigators believe that RAINEY threw drugs from his possession as he fled the police.

A K-9 positively alerted on the truck, which indicated the presence of drugs. A search of the truck revealed numerous suspected drug ledgers, but drugs were not discovered. In these ledgers, the initials "AD" was labeled next to suspected drug ledger entries. The initials "TT," and "AD," and the word "ME," also appeared next to what investigators suspect to be references to kilogram quantities of cocaine. RAINEY was arrested by SLCPD on August 29, 2014, for resisting or interfering with a felony arrest, but the case was subsequently closed and he is not in custody. Investigators know from the interception of target telephone 3 that LEMONS' street name is "AD." Investigators know from this case that Anthony Jordan's street name is "TT."

The Cryptanalysis and Racketeering Records Unit at the FBI Laboratory has examined the documents seized from RAINEY's truck and concluded that the documents contain notations of an illicit drug distribution business.

In October 2014, investigators identified Juan Ramon-GARZA as VELAZQUEZ' St. Louis coordinator through toll analysis of (314) 363-7152, used by LEMONS, and surveillance. On October 27, 2014, investigators initiated surveillance of 6680 Parker Road, being the residence of GARZA and Juan GUERRERO, coordinators placed by VELAZQUEZ      to oversea operations in St. Louis.  During this surveillance, investigators observed GARZA and

12

GUERRERO depart from the residence drive to Bank of America, located at 6950 Parker Road, St. Louis, Missouri 63033. Investigators observed GARZA exit the vehicle and enter Bank of America. Investigators were later able to determine a deposit of $8,000.00 in United States currency (all in $100 bills) was made by GARZA to an account held in Pharr, Texas.[3]

On November 10, 2014, surveillance was established on LEMONS believing that LEMONS had arranged several drug transactions with customers. At approximately 5:25 p.m., Demetrius ONEAL, a.k.a. Demetrius O'NEAL (hereinafter referred to as "ONEAL"), using (314) 443-6509, called LEMONS on target telephone 3 and asked if LEMONS was "down the way" (824 McLaran), to which LEMONS responded, "yep." At approximately 5:54 p.m., LEMONS, using target telephone 3, called ONEAL on (314) 443-6509, and asked what had happened to ONEAL. ONEAL replied, "Man, I'm coming, man." At approximately 5:58 p.m., surveillance observed a white Cadillac bearing Missouri license plate SJ8-N1L, registered as a 2000 Cadillac to Delores O'Neal, 2965 Devonshire, Florissant, Missouri 63033, park in front of 824 McLaran. A heavy set black male (later identified as ONEAL) exited the vehicle and stood in front of the front door of 824 McLaran. At approximately 5:59 p.m. (session 1119), ONEAL called LEMONS right back and said, "I'm at the door" (824 McLaran). ONEAL exited the residence approximately 20 minutes later and departed the area in the white Cadillac followed by surveillance units.

ONEAL pulled into the Christy's gas station, located at 8430 Hall Street, St. Louis, Missouri, and entered the store. A marked SLMPD unit, operated by FBI Task Force Officers,

---

[3] The issuance of a Grand Jury subpoena to Bank of America identified the above bank account was opened on October 7, 2014 in Pharr, Texas by Pedro LERMA-Marrufo. As of November 21, 2014, the date of the last known deposit, with the exception of the opening deposit of $500 in Pharr, Texas, all other known deposits have been made from the metropolitan St. Louis area. The deposits, ranging from $4,000 USC to $8,000 USC, have totaled $102,000 USC. Investigators believe the deposited money relates to the bulk shipment(s) of cocaine to the St. Louis, Missouri area, as earlier referenced by the SOI.

detained ONEAL as he exited the gas station. ONEAL denied that the Cadillac belonged to him. Officers conducted a search of the vehicle based upon probable cause that ONEAL purchased drugs from LEMONS inside 824 McLaran. Officers discovered a large amount of suspected cocaine hidden beneath an article of clothing in the back seat of the vehicle. ONEAL refused to comment on the drugs and was later released. Laboratory analysis revealed the presence of cocaine, a Schedule 2 controlled substance, with a gross weight of 705.41 grams.

At approximately 7:37 p.m., RAINEY, using (314) 288-9382, called LEMONS over target telephone 3. LEMONS said he was "wrapping it up. (finishing dealing drugs)" RAINEY said, "Quit. (stop dealing drugs)" LEMONS said, "Yeah, I know, I'm spooked to leave. (fearful of leaving 824 McLaran due to police presence)" LEMONS asked if he (ONEAL) was all right. RAINEY said, "They pulled him (O'NEAL) over, grabbed his lunch (cocaine)." LEMONS said, "What?" RAINEY replied, "Yeah, and let him (O'NEAL) go." At approximately 8:13 p.m., RAINEY called LEMONS. LEMONS said, "Yeah, where you all at? (RAINEY and O'NEAL)" RAINEY replied, "Uh, over my boy's house around the corner from you." LEMONS replied, "Alright. Alright. Here I come." At approximately 8:20 p.m., LEMONS called RAINEY. During the call, investigators believe RAINEY began talking in the background to O'NEAL while they were near one another, "So they didn't give you any paper (police report) or anything?" LEMONS and RAINEY then coordinate to meet with one another, along with O'NEAL at a residence in North County.

## SEIZURE OF $130,000.00 OF UNITED STATES CURRENCY ON FEBRUARY 4, 2015

On January 21, 2015, United States District Judge Randy Crane of the Southern District of Texas authorized the interception of wire communications of Texas-based telephone number 956-532-2406 used by FAZ. On February 4, 2015, DEA McAllen alerted FBI St. Louis

about a wire intercept that occurred earlier this day between their wire target, Roosevelt FAZ, and GARZA, using (314) 458-1535. During the call, FAZ coordinated with GARZA for a driver to pick-up money from GARZA in St. Louis. DEA McAllen informed FBI St. Louis that they had intercepted conversation between FAZ and the driver, Guillermo TREVINO), about the money pick-up. At approximately 7:35 p.m., surveillance identified TREVINO at a Wal-mart in Collinsville, Illinois driving a semi-tractor trailer. At approximately 9:10 p.m., GARZA met briefly with TREVINO in his semi-tractor trailer on Wright Street near Broadway in St. Louis City. At approximately 9:12 p.m., TREVINO, using (618) 520-2647, called FAZ and said he is having some tacos now and all he could eat was 13 tacos (13 packages of bundles USC received from GARZA) (session 602 – FAZ wiretap). Predicting the money transfer occurred, surveillance units followed TREVINO and executed a traffic stop of the vehicle on interstate 55 in Jefferson County, Missouri.

At approximately 10:02 p.m., a marked Jefferson County Missouri Police cruiser, highway interdiction team, executed a traffic stop of TREVINO's tractor trailer at mile marker 172 on Interstate 55. During the stop, the officer discovered a black bag containing 13 individually wrapped bundles of United States currency, each of which was wrapped in black tape. The officer asked TREVINO about his knowledge of the bag and United States currency. TREVINO stated he had found the bag at a truck stop lying on the ground. The United States currency was seized as evidence of drug proceeds. On February 5, 2015, an official count was conducted of the seized United States currency, which totaled $130,000.00.

### THE CONTROLLED DELIVERY AT THEODOSIA ON FEBRUARY 6, 2015

In December 2014, the McAllen Resident Agency (RA), of the San Antonio Division of the FBI, developed a confidential source (CS) that transported cocaine for the Jose Perez-

CORTEZ DTO prior to cooperating with the government. The CS said he/she transported bulk shipments of cocaine to various United State cities at the direction of CORTEZ. According to the source, on five separate occasions, the CS delivered 20 kilograms respectively to Juan Ramon GARZA[4] at 6327 Theodosia Avenue, St. Louis, Missouri. Investigators knew from following GARZA in St. Louis in the fall of 2014, that 6327 Theodosia Avenue was a suspected location for the importation of drugs into St. Louis for the LEMONS CE.

On February 3, 2015, surveillance at or near McAllen, TX, observed Jose Eduardo AGUIRRE-CAVAZOS, driving a red Honda Accord, bearing Texas license plate DGV-1824, registered to Daniel SALAZAR, 920 Rankin Street, Mission, Texas meet with the CS. During the meeting, AGUIRRE-CAVAZOS inserted 20 individual kilograms of cocaine, each of which was wrapped with black tape, into the trap of the CS's vehicle. Shortly after AGUIRRE-CAVAZOS' departure from the meeting, the FBI McAllen RA seized the suspected cocaine. The evidence was transported to the FBI McAllen office and submitted as evidence. The drugs were field tested, which resulted in a presumptive positive for the presence of cocaine. The total drug weight package was 23.92 kilograms; subsequent laboratory testing revealed this to be approximately 21.9 kilograms of cocaine.

On February 4, 2015, earlier in the evening at approximately 5:24 p.m., LEMONS, using target telephone 5, was intercepted texting VELAZQUEZ on 52-8991500827 (session 17 – LEMONS wiretap), "Don't 4get tha 1000 off tha ugly sis (kilogram of cocaine)." From toll analysis, investigators knew GARZA, using (314) 458-1535, and LEMONS, using target telephone 5, communicated with VELAZQUEZ on 52-8991500827. Based upon toll analysis, investigators believed prior to the interception of communications over target telephone 5, used

---

[4] The investigation has revealed GARZA coordinated drug deliveries to LEMONS in St. Louis at the behest of VELAZQUEZ and also coordinated United States currency back Mexico.

by LEMONS, that VELAZQUEZ was coordinating the importation of cocaine into St. Louis with LEMONS and GARZA. Thus, investigators concluded VELAZQUEZ, using telephone number 52-8991500827, is the cocaine source of supply for the LEMONS DTO.

On February 5, 2015, VELAZQUEZ, using Mexican telephone number 52-8991500827, was intercepted speaking with LEMONS about the 20 kilograms of cocaine to be delivered on February 6, 2015. At approximately 9:33 p.m. (session 33 – LEMONS wiretap), VELAZQUEZ texted LEMONS on target telephone 5, "My sister (cocaine) is close to you." From this intercept, investigators believe VELAZQUEZ referred to the CS's bulk cocaine shipment to St. Louis, as organized by CORTEZ previous in the week.

On February 6, 2015, investigators in St. Louis conducted a controlled delivery with the CS of imitation cocaine to 6327 Theodosia Avenue, being the business location of MILLER Auto sales, and a known location for the importation of cocaine for the LEMONS DTO. Prior to delivering the imitation cocaine, GARZA dropped off several items at 6327 Theodosia to Clarence MILLER, a mechanic that worked at the business. Following the delivery, investigators executed a search warrant and arrested MILLER at 6327 Theodosia Avenue after he had began removing the imitation cocaine from the CS's vehicle. Investigators also detained GARZA and CANTU during a vehicle stop. Investigators seized 57 individually wrapped bundles of United States currency, each of which was wrapped with black tape, totaling $570,245.00 from 6327 Theodosia Avenue. The black bundles of United States currency were individually labeled "1-57."

At 11:48 a.m., VELAZQUEZ, using 52-8991500827, called LEMONS on target telephone 5 (session 46 – LEMONS wiretap) and asked, "Uh, the boys (GARZA and CANTU) have been working." VELAZQUEZ asked, "They already in the house (7118 Idlewild

Avenue)?" LEMONS replied, "I don't know. They ain't call me." VELAZQUEZ told LEMONS to call the shop (6327 Theodosia Avenue) and find out. At 12:30 p.m., LEMONS texted VELAZQUEZ, "Bad bro." (session 50 – LEMONS wiretap). One minute later VELAZQUEZ called LEMONS (session 51 – LEMONS wiretap). LEMONS said it was "It ain't good." LEMONS then said "they (police) all over there man." VELAZQUEZ said, "I still got some check (United States currency) over there in the house (7118 Idlewild Avenue)." VELAZQUEZ said to LEMONS, "Let me find out if we uh, can do with the check at the house, cause I need to pick em up," which LEMONS responded, "You ain't listen to what I'm sayin. The people (police) at the house."

### THE SEIZURE OF DRUG LEDGERS AND BANK SLIPS ON FEBRUARY 6, 2015

On February 6, 2015, GARZA consented to a search at 7118 Idlewild Avenue, being GARZA's residence, where $305,380.00 in United States currency was seized, making the cumulative total of the total United States currency seized in the St. Louis enforcement operation on February 6, 2015 $875,625.00. Significantly, during the consent search of GARZA's residence, agents also seized additional notes, which they believe to constitute drug ledgers. The Cryptanalysis and Racketeering Records Unit at the FBI Laboratory has examined the documents seized from GARZA's residence and concluded that the documents contain notations of an illicit drug distribution business. The analysis concluded, in part, that notations found on some of the items are consistent with the receipt of "white packages," believed to be a slang reference to kilogram quantities of cocaine. Moreover, the analysis revealed notations consistent with the movement of money. Specifically, the records identify "packages of $10," which is believed to be consistent with monetary bundles of $10,000.00. Investigators believe that the totality of the evidence, specifically the packaging and seizures of United States currency in $10,000.00

increments, supports this conclusion. During the consent search at 7118 Idlewild, investigators also recovered bank deposit slips, which they believe constitute evidence of money laundering violations.

### ADDITIONAL INVESTIGATION OF NARCOTICS TRAFFICKING IN 2015

On June 1, 2015, at approximately 3:20 p.m., VELAZQUEZ, using target telephone 6, called Adrian LEMONS on (314) 372-9726 over the court authorized wire intercept of target telephone 6. LEMONS stated to VELAZQUEZ words to the effect that he (LEMONS) will need 4-6 weeks to get back what he owes VELAZQUEZ (drug debt). LEMONS asked VELAZQUEZ about the "national" (different drug besides cocaine), which VELAZQUEZ responded he can send to LEMONS whenever he needs it. VELAZQUEZ asked LEMONS for $3,000, which LEMONS said he will have by tomorrow. LEMONS complained about being in the "red" (owing VELAZQUEZ the drug debt) and said words to the effect that he needed the "national" to make up the debt. VELAZQUEZ stated he can send the "national" by this weekend. VELAZQUEZ told LEMONS that he (VELAZQUEZ) sent the Bank of America account to him (LEMONS). VELAZQUEZ told LEMONS that he needed the money to pay the "truck driver," LEMONS replied he will take it off the "national" (LEMONS will take the $3,000 of the profits from selling the "national"). VELAZQUEZ stated he did not want to get involved in the "national," but he is concerned about his money situation (drug debt). VELAZQUEZ asked LEMONS how much (national) he wanted, which LEMONS responded, "500."

On July 17, 2015, VELAZQUEZ, using target telephone 6, called LEMONS on (314) 372-9726 and asked about their pending meeting. LEMONS asked VELAZQUEZ how long it would take to cross over (cross the United States/Mexican border). VELAZQUEZ told LEMONS he will wait for LEMONS at the bridge. LEMONS told VELAZQUEZ to keep his

phone nearby because LEMONS will be calling him soon. From this call, investigators believe that LEMONS would be meeting VELAZQUEZ in Mexico soon to coordinate future drug transactions.

On August 9, 2015, Adrian LEMONS crossed the United States border into Mexico at a border crossing near McAllen, Texas, which is opposite the border of Reynosa, Mexico. LEMONS traveled into Mexico with Britteny SPENCER. LEMONS and SPENCER were stopped coming back into the United States and questioned by the United States Customs Border Patrol. LEMONS claimed he and SPENCER traveled to Mexico to shop.

Investigators believe LEMONS traveled to Reynosa, Mexico to meet with VELAZQUEZ to discuss the continuation of cocaine shipments to LEMONS in St. Louis. This meeting corresponds to the intercepted conversation on July 17, 2015, referenced above.

Beginning on October 9, 2015, telephone number (956) 777-4781 attempted to contact LEMONS over (314) 372-9726, used by LEMONS, twice and then once again on October 11, 2015. On October 14, 2015, LEMONS exchanged several SMS text messages with (956) 777-4781. Telephone number (956) 777-4781 is a prepaid phone with unknown subscriber. Further, area code (956) is located in the Rio Grande Valley, Texas, which is a focus area of this investigation. Considering LEMONS uses (314) 372-9726 to communicate with his suppliers and the nature of the contact only on October 14, 2015, investigators deduce that the user of (956) 777-4781 is part of the VELAZQUEZ DTO. Further, toll analysis of (956) 777-4781 revealed recent contact with (956) 222-8707. According to the United States Border Patrol, the user of (956) 222-8707 is Frank ALANIZ, a scout for drug mules crossing the United States / Mexico border in La Joya, Texas. As a scout, ALANIZ conducts surveillance for Border Patrol presence in order to safely cross drug mules from Mexico into the United States.

On November 16, 2015, investigators approached the user of (956) 777-4781 at 19717 FM 493, La Blanca, Texas. The user of the phone was VELAZQUEZ. VELAZQUEZ was taken into local custody on a state parole violation from the state of Texas.

## INVESTIGATION INVOLVING 11553 POGGEMOELLER

11553 Poggemoeller is LEMONS' primary residence throughout the course of this investigation. The investigation into LEMONS, as demonstrated herein, reveals that he imports multiple kilogram quantities of cocaine into St. Louis for the purpose of distribution. LEMONS has an expansive criminal network in St. Louis responsible for the distribution of the cocaine that is imported in from Mexico. This investigation encompasses a long-term drug conspiracy led in part by LEMONS.  As previously stated, earlier today, agents executed a search warrant at this location and recovered United States currency, a firearm, suspected drug notes, and a note leading them to the subject property/storage locker.

On August 25, 2014, at approximately 11:58 a.m., Rashad BISHOP, using (618) 917-3797, called LEMONS on target telephone 3 and asked where he was, to which LEMONS responded, "the crib"(11553 Poggemoeller). BISHOP stated he was going to "slide through" (come to LEMONS' house). Investigators know that subjects often use the phrase "slide through" to indicate meeting with one another for the purpose of conducting a drug transaction. Based on this call, at approximately 12:30 p.m., surveillance was established at 11553 Poggemoeller, being the residence of LEMONS. Parked in front of the residence was a black Dodge Charger bearing Missouri license plate DK2-J1Y, registered to EAN Holdings (Enterprise Leasing). Investigators observed LEMONS operate this vehicle during prior surveillance.

At approximately 1:10 p.m., surveillance observed a light colored Chevrolet Traverse, bearing Illinois license plate V78-3221, registered as a 2009 Chevrolet Utility, to Shelby and

Rashad BISHOP, 614 Washington Avenue, Alton, Illinois 62002, arrive and park in the driveway of 11553 Poggemoeller . At approximately 1:12 p.m., BISHOP, using (618) 917-3797, called LEMONS on target telephone 3, and said to "let his door (garage) down." Moments later the garage door raised and BISHOP entered and went inside the residence through the garage. At approximately 1:13 p.m., BISHOP exited the residence through the garage door and departed the area in the Traverse followed by surveillance. BISHOP conducted several surveillance detection maneuvers following his departure, which forced investigators to discontinue the surveillance. At approximately 1:20 p.m., BISHOP called LEMONS and said he thought he was being followed by a light colored van after he left his house.  Investigators conducting surveillance believe that BISHOP saw the surveillance vehicles, which included a light colored van, and conducted counter measures to evade law enforcement. Investigators know from experience working drug investigations that dealers employ such tactics when they are in possession of drugs. In this case, investigators believe that BISHOP employed such evasive maneuvers because he possessed drugs, which he purchased from LEMONS at 11553 Poggemoeller .

The above example demonstrates the manner in which LEMONS distributes narcotics from 11553 Poggemoeller . Investigators have conducted numerous surveillance operations of LEMONS whereby LEMONS departed and arrived at 11553 Poggemoeller  during drug sales. 11553 Poggemoeller  is in North St. Louis County miles away from St. Louis City, which is where LEMONS distributes cocaine mostly. Investigators believe LEMONS feels safer at 11553 Poggemoeller  due to the distance between 11553 Poggemoeller  and where he distributes cocaine predominately,  at other properties as identified in the investigation. As such, investigators believe that LEMONS maintains important documents relating to criminal activity at 11553 Poggemoeller  and specifically proceeds from this criminal activity.  Investigators

22

confirmed this suspicion today be recovering United States currency and other items at 11553 Poggemoeller.   However, agents believe that LEMONS has further compartmentalized his operations by hiding additional currency and the other items referred to in the attached list at the subject location/storage locker.

Investigators obtained a court authorized PLW for one of LEMONS' cell phones, (314) 372-9726. The PLW has allowed investigators to determine, within a variance, the location of the phone, which is where LEMONS can be found. This investigative technique has assisted in surveillance operations for a myriad of reasons. For example, LEMONS is hyper aware of law enforcement activity due to his criminal activity; and moreover, many of the drug distribution locations are difficult for investigators to observe without compromising the surveillance operation.

The below graphical analysis is approximate PLW locations for (314) 372-9726 from September 1, 2015 to November 19, 2015. This PLW further demonstrates LEMONS' presence at certain drug distribution locations, but the data is not exclusive of LEMONS activities all day every day. For example, investigators believe LEMONS would not always carry telephone (314) 372-9726. Additionally, investigators sometimes would not receive PLW data if the targeted cell phone was powered off.



**8573 North Broadway, St. Louis, Missouri 63147**

8573 North Broadway  has been identified as a stash house for drugs and a drug distribution location for LEMONS and members of his organization. According to CW-2, beginning in November 2012, he/she routinely purchased large amounts of cocaine from LEMONS inside 8573 North Broadway . This relationship continued in the same manner between CW-2 and LEMONS until approximately late winter 2014. Further, according to CW-2, Anthony JORDAN purchased numerous kilograms from LEMONS inside 8573 North Broadway .[5] Lastly, CW-2 said words to the effect that LEMONS carried a firearm while distributing cocaine from 8573 North Broadway .

---

[5] On August 26, 2015, the federal grand jury for the Eastern District of Missouri returned a suppressed indictment in cause number 4:15 CR 404 HEA(NAB) charging Anthony JORDAN with the following offenses: (1) Conspiracy to distribute cocaine a Schedule II controlled substance for events occurring from January 2002 through the date of the indictment, in violation of Title 21, United States Code, Section 841(a)(1); (2) Possession, brandishing, and discharge of a firearm in furtherance of a drug trafficking crime on or about December 29, 2013, resulting in the deaths of Robert Parker and Clara Walker, in violation of Title 21, United States Code, Section 924(j); (3) Possession, brandishing, and discharge of a firearm in furtherance of a drug trafficking crime on or about January 21, 2014, resulting in the death of Michail Gridiron, in violation of Title 21, United States Code, Section 924(j).  An arrest warrant was issued as a result of said indictment. On August 27, 2015, Anthony JORDAN was arrested pursuant to a Federal arrest warrant.  On January 7, 2016, the grand jury returned the suppressed superseding indictment previously referred to herein.

On June 25, 2014, Laron COLEMAN was intercepted over target telephone 1 ordering cocaine from LEMONS over target telephone 3. Investigators then intercepted COLEMAN coordinating to meet several individuals that provided money to COLEMAN for drugs, which COLEMAN pooled together for the purchase with LEMONS. Surveillance then followed COLEMAN and his criminal associate, Louis FELTON, to 8573 North Broadway . COLEMAN went inside the rear of 8573 North Broadway , which investigators believe was for the purpose of buying drugs from LEMONS. Again, on June 30, 2014, COLEMAN was intercepted speaking to LEMONS about purchasing more drugs. Investigators believe that COLEMAN possibly detected surveillance units while COLEMAN was driving to 8573 North Broadway . Due to the potential risk to surveillance units, investigators did not confirm what house COLEMAN went into to meet with 8573 North Broadway  but he was in the vicinity of 8573 North Broadway .

In August 2014, the FBI surreptitiously installed equipment capable of obtaining and recording video and/or still photographs of 8573 North Broadway , which is located in an area known for drug trafficking and violence. The surrounding streets have pedestrian traffic throughout the day and night. Investigators learned through this investigation that there were several known drug houses in the immediate vicinity of 8573 North Broadway . The investigative team knows from experience working drug investigations in violent St. Louis City neighborhoods that criminals are aware of law enforcement activity and techniques, such as the one employed in this manner. Immediately following the installation of this equipment, investigators did not see LEMONS frequent 8573 North Broadway  until after the removal of the camera in approximately February 2015.

According to CW-2, he/she purchased cocaine from LEMONS inside 8573 North Broadway  almost weekly from November 2012 to late spring 2014. CW-2's information

concerning the manner in which LEMONS uses 8573 North Broadway as a drug house has been corroborated by other witnesses and physical surveillance.

According to CW-3, he/she identified 8573 North Broadway as LEMONS' main location for drug distribution. LEMONS provided CW-3 with one ounce crack cocaine in August 2015 from inside 8573 North Broadway . Additionally, in December 2015, CW-3 brought cocaine to LEMONS inside **Location 2** and LEMONS helped CW-3 make crack cocaine (cocaine base).

In the fall of 2015, the FBI surreptitiously installed equipment capable of obtaining and recording video and/or still photographs of 8573 North Broadway . Through this technique, investigators have observed a high volume of individuals arriving at 8573 North Broadway , entering the rear entrance of the residence, and briefly staying inside before departing. This surveillance is on-going and incorporates activity through December 2015. The investigative team knows from experience working drug investigations that this behavior is consistent with drug customers purchasing drugs from within 8573 North Broadway .

The below graphical analysis is approximate PLW locations for (314) 372-9726 from September 1, 2015 to November 19, 2015. This PLW further demonstrates LEMONS' presence at 8573 North Broadway , but the data is not exclusive of LEMONS activities all day every day,

as                                    referenced                                    above.



## FINANCIAL INVESTIGATION INTO ADRIAN LEMONS

**Lack of legitimate Income:**  According to the Missouri Division of Employment Security, an agency that records income tax paid by persons living or working in Missouri, Adrian LEMONS did not receive taxable wages in Missouri between April 1, 2013 and June 30, 2013 or between October 1, 2014 and the end of September 2015.  During the course of this investigation, my team and I conducted numerous surveillances of LEMONS from approximately July 2014 to the present and we never observed him engaged in activity that could reasonably be identified as legitimate employment. During the review of LEMONS' financial records that included a review of his credit union checking account, my team and I did not find any direct deposits from an employer or deposits of payroll checks issued to LEMONS.

**Money Laundering at Neighbors Credit Union:**  Records provided pursuant to a subpoena by Neighbors Credit Union, 6300 South Lindbergh, St. Louis, Missouri 63123, show that Adrian LEMONS opened an individual checking account on February 9, 2012. At that time,

LEMONS identified his employer as Lawson Tasty Wings, 1017 Airport Road, St. Louis, Missouri. Lemons also stated he had lived at 8546 Concord Place, St. Louis, Missouri 63147 for the past twenty-eight years, or since he was approximately six years old.

On September 23, 2013, LEMONS applied for a Visa credit card from the credit union. On his application, LEMONS stated that since August 24, 2013, he had been the owner of All Property Investment, 8546 Concord, St. Louis, Missouri 63147 . LEMONS also stated that the company had an annual gross income of $50,000 and a net annual income of $35,000. LEMONS identified his personal reference as Charda Davis, 11553 Poggmoeller [sic], St. Louis, Missouri 63138.

Between July 10, 2012 and September 15, 2014, a total of $28,800 in cash was deposited into Lemons' checking account. There were fifteen separate deposits ranging from $1,000 to $5,200. Eight of the fifteen deposits were made in amounts of either $1,000 or $1,500 and were deposited between January 17, 2013 and September 16, 2013.

Based on my training and experience, and the training and experience of other veteran investigators with whom I have worked on this investigation, it is my opinion that Lemons acquired the cash from drug trafficking and structured the deposits in an effort to avoid currency transaction reporting requirements.

**Acquisition of Real Property:** Between April 8, 2009 and April 17, 2014, Lemons acquired a total of ten properties in the City of St. Louis and St. Louis County with a total appraised value of $350,200. LEMONS purchased two of these properties with the equivalent of cash. LEMONS obtained five of these properties from Stephen Huggans, who is identified on property records as LEMONS'cousin; and he purchased three other properties for undisclosed purchase prices. The following are summaries of those property acquisitions.

**Purchase of 815 Elias Avenue, St. Louis, Missouri 63147:** According to the records of the City of St. Louis Recorder's Office and Assessor's Office, LEMONS purchased this property for $8,000 on February 29, 2012 as a single person from a private seller.

On February 27, 2012, LEMONS purchased a total of $4,000 in United States Postal Service money orders. LEMONS bought two $1,000 money orders at the post office at 9810 Halls Ferry Road, St. Louis, Missouri 63126, and two $1,000 money orders at the post office at 8390 North Broadway, St. Louis, Missouri 63147. These two post offices are approximately 2.3 miles apart.

The money orders were made payable to First Financial Title Agency. The First Financial Title Agency, 1224 Fern Ridge Parkway, Suite 100, Creve Coeur, Missouri 63141, handled the closing on LEMONS' purchase of 815 Elias Avenue.

On 8/30/2013, LEMONS transferred ownership of the property via a quit claim deed from himself to All Property Investments LLC. No Certificate of Value ("COV") was filed for this transaction.

The city has not issued any building permits for this property since 2009. In 2013, the city appraised this property at $37,300.

**Purchase of 877 Wall Street, St. Louis, Missouri 63147 (Location 3):** According to subpoenaed records, on July 8, 2014, Adrian LEMONS used $17,320.28 in cash to purchase a cashier's check from Neighbors Credit Union, 8935 Jennings Station Road, Jennings, Missouri 63136. The check was made payable to Continental Title of Missouri (Continental Title), 8820 Ladue Road, St. Louis, Missouri 63124.

Records subpoenaed from Continental Title show that on or about July 8, 2014, LEMONS closed on the purchase of the property at 877 Wall Street, St. Louis, Missouri 63147.

The purchase price was $18,000, and Lemons used the cashier's check he had purchased at Neighbors Credit Union as partial payment. LEMONS had the property deeded to All Property Investment LLC, 8546 Concord Place, St. Louis, Missouri 63147.

Adrian LEMONS signed the deed as a member of All Properties Investments LLC. Lemons signed the Certificate of Value filed with the City Assessor's Office. The Assessor's Office identified the purchase as being made by an investor, indicating the sale was not a fair market value transaction and was not to be considered in determining tax rates for the neighborhood. The COV does not identify the purchase price.

On February 23, 2015, Lemons transferred ownership of 877 Wall Street  via quit claim deed from All Property Investments LLC to the Revocable Living Trust of Adrienne LEMONS. Adrian LEMONS signed the quit claim deed as the grantor and as the grantee and as trustee of the trust. [Investigator's Note:  Investigators believe Adrienne Lemons is a family member of Adrian Lemons].  The Certificate of Value ("COV") filed with the City of St. Louis Assessor's Office states that the transaction was between family members and did not involve payment. The City of St. Louis has not issued any building permits for this property since June 11, 1999, when a permit was issued to erect a six foot chain link fence on the sides and rear of the property. In 2014, the city appraised this property at $29,300.

**LEMONS' acquisitions of real property from Stephen Huggans:**

According to numerous public and law enforcement records, Stephen Huggans is a forty-three year-old St. Louis native and the half brother of Darwin Markeith Huggans, a.k.a. Mark Huggans. In 1990, Mark Huggans was convicted in the City of St. Louis of drug trafficking and sentenced to ten years imprisonment. In 1995, he was convicted in the City of St. Louis of possession of a controlled substance and sentenced to five years imprisonment.  In 2007, he was

arrested for conspiracy to distribute more than five kilograms of cocaine by the Drug Enforcement Administration in St. Louis. In 2009, he was convicted of that charge and sentenced to life imprisonment.

In 2005, the St. Louis FBI received information from a reliable confidential source that Stephen Huggans was involved in drug trafficking with his brother Mark Huggans. As described below, the COV for the transfer of 3814 Council Grove Avenue states that the transaction was between cousins, indicating that Lemons and Stephen Huggans are cousins. The following properties were transferred from Stephen Huggans to Adrian Lemons.

**2836 Lyndhurst Avenue, St. Louis, Missouri 63114:**  On October 20, 2010, Stephen Huggans purchased this property from Sara M. Townsend. The COV filed with the County Assessor's Office for the transaction does not identify the sales price.   On March 7, 2012, Huggans transferred this property via quit claim deed to LEMONS. The COV does not identify the sales price, and has a check in the box for the question, "By deed between husband and wife, parent and child, without actual consideration, to or from a family corporation or partnership or trust for no consideration?" On August 30, 2013, LEMONS transferred ownership of this property from himself to All Property Investments LLC.  In 2014, St. Louis County appraised this property at $28,000.

**5257-5259 Northland Avenue, St. Louis, Missouri 63147:**  On July 15, 2005, Stephen Huggans purchased this property as a foreclosure from Fannie Mae for $26,900. On April 28, 2006, Huggans obtained a building permit from St. Louis City to convert the property from a two family residence to a single family residence. The cost of the work was estimated at $15,000. On December 28, 2007, St. Louis City issued Huggans an occupancy permit to use the property as a

single family Section 8 rental.   St. Louis City has not issued any building permits to this property since December 28, 2007.

On May 29, 2012, Huggans transferred ownership of the property to LEMONS. The COV filed with the City Assessor's Office identified the sales price as $5,000.  On August 28, 2013, LEMONS transferred ownership of this property from himself to All Property Investment LLC.  On October 14, 2013, LEMONS filed another quit claim deed transferring this property from himself to All Property Investment LLC. The COV filed with the City Assessor's Office states the transfer involved, "putting in the name of my company."  In 2014, St. Louis City appraised this property at $18,800.

**4569-4573 Alcott Avenue, St. Louis, Missouri 63120:**  On December 7, 1993, St. Louis City issued a building permit for demolition of the single family residence at 4569 Alcott Avenue. Since the demolition, the property has consisted of a vacant lot that the city appraised at $900 in 2014. The adjacent property at 4573 Alcott is a single family residence that the city appraised at $11,900 in 2014.

On August 23, 2012, Stephen Huggans purchased these two properties from Esther Nall, 1433 Powder Drive, St. Louis, Missouri 63366. The COV filed with the City of St. Louis Assessor's Office has a handwritten check mark indicating the transfer was between "husband & wife, parent & child without actual consideration."

On August 28, 2013, Huggans transferred these two properties to All Property Investments LLC.  The COV filed with the City of St. Louis Assessor's Office states there was no consideration paid for the property; however, there are no checks in the spaces provided to identify the nature of the relationship between the grantor and grantee.

The city has not issued any building permits for these two properties in the past ten years.

**1600 McLaran Avenue, St. Louis, Missouri 63147:** On June 5, 2012, Stephen Huggans LLC purchased this property as a foreclosure from Deutsche Bank. No COV for this transaction was filed with the St. Louis City Assessor's Office. On August 28, 2013, Huggans transferred the property via a quit claim deed to All Property Investments LLC. The COV filed with the St. Louis City Assessor's Office does not identify the purchase price. St. Louis City has not issued a building permit for this property since 1996. St. Louis City property records identify this property as a single family residence appraised at a value of $40,600 in 2014.

**3814 Council Grove Avenue, St. Louis, Missouri 63120:** On May 28, 2009, Stephan Huggans purchased this property as a foreclosure for $24,000 from Wells Fargo Bank NA. On April 17, 2014, Huggans transferred ownership of this property via quit claim deed to All Property Investment LLC. The COV filed with the County Assessor's Office states the transaction involved relatives, and has the handwritten word "cousins" on the explanation line. In 2014, St. Louis County appraised this property at $58,300.

**Lemons' acquisition of three additional properties:**

The following information summarizes Lemons' acquisition of three additional properties:

**8546 Concord Place, St. Louis, Missouri 63147:** On April 8, 2009, Lamar and Beatrice Walker sold this property to Adrian Lemons. The COV filed with the St. Louis City Assessor's Office states the transaction involved a transfer "between husband and wife or parent and child without actual consideration." Public and law enforcement records identify Lamar Walker as a person who died in 2011 at the age of seventy-eight and Beatrice Walker as a living seventy-eight year female. Based on these facts and other information in this affidavit, my team and I believe that Lamar and Beatrice Walker are LEMONS' parents or grandparents.

33

On August 28, 2013, LEMONS transferred ownership of this property via quit claim deed from himself to All Property Investments LLC.  St. Louis City has not issued a building permit for this property since 2008. In 2014, the city appraised this property at $34,200.

**11553 Poeggemoeller Avenue, St. Louis, Missouri 63138:**   On June 22, 2012, LEMONS purchased this property from JTC Enterprises LLC, 4144 Lindell Boulevard, #225, St. Louis, Missouri 63108.  The deed for the transfer was signed by Tonia Harris as a member of JTC Enterprises LLC.  The COV filed with the St. Louis County Assessor's Office was signed by "Dwayne Rainey, Owner," and does not identify the sales price.

On August 30, 2013, LEMONS transferred ownership of this property from himself to All Property Investment LLC. The COV filed with the St. Louis County Assessor's Office for the transaction does not identify a sales price.  In 2014, the county appraised this property at $89,100.

**5518 Floy Avenue, St. Louis, Missouri 63136:**   On August 16, 2012, Robert Taylor purchased this property as a foreclosure for $54,743. On October 4, 2013, Taylor transferred ownership of this property to All Property Investments LLC. The COV filed with the City of St. Louis Assessor's Office identified the purchase price as "0." The handwritten response to the question, "If no monies were exchanged on this transaction, please give reason below," was, "putting in the name of my company."

City property records identify this property as a single family residence that the city appraised at $32,000 in 2014. The city has not issued any building permits for this property since 2004.

The following chart summarizes LEMONS' acquisition of the four properties from Stephen Huggans:

| Address | Date of Transfer | Appraised Value |
|---|---|---|
| 2836 Lyndhurst Avenue | March 7, 2012 | $28,000 |
| 5257-5259 Northland Avenue | May 29, 2012 | $18,800 |
| 4569-4573 Alcott Avenue | August 28, 2013 | $11,900 |
| 1600 Mclaran Avenue | August 28, 2013 | $40,600 |
| 3814 Council Grove Avenue | April 17, 2014 | $58,300 |
| | **Total** | **$157,600** |

The following chart summarizes LEMONS' acquisition of the ten properties described above:

| Address | Date Acquired by Lemons | Date Transferred to All Property Investments LLC | Appraised Value |
|---|---|---|---|
| 815 Elias Avenue | February 29, 2012 | August 30, 2013 | $37,300 |
| 877 Wall Street | July 8, 2014 | July 8, 2014 | $29,300 |
| 2836 Lyndhurst Avenue | March 7, 2012 | August 30, 2013 | $28,000 |
| 5257-5259 Northland Avenue | May 29, 2012 | August 28, 2013 | $18,800 |
| 4569-4573 Alcott Avenue | | August 28, 2013 | $11,900 |
| 1600 Mclaran Avenue | | August 28, 2013 | $40,600 |
| 3814 Council Grove Avenue | | April 17, 2014 | $58,300 |
| 8546 Concord Place | April 8, 2009 | August 28, 2013 | $34,200 |
| 11553 Poegemoeller Avenue | June 22, 2012 | August 30, 2013 | $89,100 |
| 5518 Floy Avenue | | October 4, 2013 | $32,000 |
| | | **Total** | **$350,200** |

**Transfer of Ten Properties:**  On February 23, 2015, LEMONS transferred all of the ten properties described above via quit claim deeds from All Property Investment LLC to the Revocable Living Trust of Adrienne LEMONS. Adrian LEMONS signed the deeds as the grantor and as the grantee and as the trustee of the trust. All of the COVs state the transfers were between family members and did not involve payment.

As described above, on February 6, 2105, law enforcement officers conducted a controlled delivery of sham drugs to a stash house with which LEMONS was closely associated and on the same date, seized a large amount of cash drug proceeds. Before this law enforcement

35

activity, LEMONS had owned most of the ten properties since 2012 or before and had held all but one of the properties in his corporation's name since 2013. It is my opinion, and the opinion of other veteran investigators with whom I have worked on this investigation, that after the February 2015 law enforcement activity, LEMONS transferred the ten properties to a revocable trust in an effort to minimize the possibility that law enforcement agencies could seize them.

**Summary:**  Based on the facts in this affidavit including: LEMONS' purchase of the cashier's check from Neighbors Credit Union with cash; his structured purchase of the US Postal money orders with cash; his lack of legitimate employment; and his involvement in drug trafficking, it is my opinion and the opinion of other veteran investigators with whom I have worked on this investigation, that LEMONS used drug proceeds to pay for at least part of the purchase price of 815 Elias Avenue and 877 Wall Street. It is also our opinion that LEMONS did provide Stephen HUGGANS some consideration for the five properties valued at $157,600, four of which Huggans purportedly transferred to LEMONS. The investigative team believes that it is possible, the consideration LMEONS provided to HUGGANS for the properties could have been United States currency, or controlled substances, or a combination thereof.

**Connection of Property Acquisitions to Locations to Be Searched:**  According to the records of the Missouri Secretary of State, All Property Investment LLC was created on August 24, 2013. The corporation's Articles of Organization identify Adrian LEMONS, 8546 Concord Place, St. Louis, Missouri 63147, as the company's Registered Agent and sole organizer. On all of the documents filed with the respective Recorder's Offices for the above described real property transactions, the address for All Property Investments LLC was identified as 8546 Concord Place, St. Louis, Missouri 63147.

## SUMMARY AND CONCLUSION

As demonstrated by the foregoing, which the investigative team knows from the court authorized interceptions, surveillance, enforcement operations and seizures, and from the reasonable interpretations and context of the conversations in view of training and experience and from other sources of information cited herein, that the VELAZQUEZ/LEMONS Continuing Criminal Enterprise is an extensive, long term, entrenched enterprise that has distributed hundreds of kilograms of cocaine throughout the St. Louis, Missouri area over a period of years, ranging from 2012 through 2015.

Further, I believe from the above that the enterprise employs numerous locations, including "safe houses," in which members transact the enterprise's drug related business and keep, or is likely to keep, writings and records pertaining to the organization's trafficking activity. As referenced herein, the drug ledgers seized from RAINEY on August 25, 2014, as well as the drug ledgers seized inside 7118 Idlewild from GARZA on February 6, 2015, provide investigators insight into the manner and means in which this criminal organization collects and launders proceeds from drug trafficking. For example, RAINEY's drug ledger item 10.1, according to the Crypto Analysis unit, decoded drug transaction records totaling the amount of $300,000.00, which is consistent with RAINEY being a multiple kilogram level dealer. In addition, it is suspected these locations are utilized for the generation and/or concealment of funds derived from that activity. From the information set forth, I believe that evidence as set forth in the attached "list" is contained within the above location, and that said items constitute evidence of the continuing criminal enterprise, conspiracy to distribute cocaine, and money laundering offenses described herein.

Based upon my training and experience, I know that persons engaged in illegal activity, including drug distribution, may maintain storage lockers, including storage lockers in the name

37

of another person, to secrete or hide evidence, contraband, United States currency, and the items described in the attached LIST. Moreover, the totality of the investigation, including the seizure of drug notes and ledgers, and the seizures at 11553 Poggemoeller on today's date, only bolsters my professional opinion that there is probable cause to believe the items contained in the LIST are located in the subject property/storage locker described.

I submit this affidavit in support of search warrant for the location which is within the jurisdiction of the reviewing Court. I have reviewed the description of the premises/storage locker, and believe it to be an accurate, particularized description for the subject property/storage locker to be searched at the address listed above.

As part of my experience and training as an FBI Special Agent and that of officers and agents of the investigating team, we have accumulated information and training in the area of narcotics based economic crime. I have had extensive experience, as have other members of the investigating team in debriefing defendants, witnesses, informants, and others who have experience in gathering, spending, converting, transporting, distributing and concealing proceeds of narcotics trafficking. In this regard, I and other members of the investigative team have participated in investigations which have linked the relationship of drug traffickers through business documents and drug records kept by conspirators. I and members of the investigative team have received training regarding customs and practices of drug conspiracies which involve significant amounts of currency.

Based upon the investigating team's experience and our participation in other past and pending investigations involving cocaine, heroin, and marihuana, I know:

(a)     That drug traffickers very often place assets in names other than their own to avoid detection of these assets by investigating government agencies;

38

(b)     That even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

(c)     That large scale narcotics traffickers commonly must maintain on hand large amounts of United States currency in order to maintain and finance their ongoing narcotics business and often keep said currency in a residence under their control;

(d)     That drug traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other papers relating to the transportation, ordering, sale, and distribution of controlled substances; that when drug traffickers distribute their narcotics to their clients, the aforementioned books, records, receipts, notes, ledgers, etc. are frequently maintained in traffickers' residences where drug traffickers have access to them;

(e)     That it is common for large scale dealers to secrete contraband, proceeds of drug sales and records of drug transactions in a residence directly related to them among other places;

(f)     That persons involved in large scale drug trafficking often conceal in residences large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting or spending of large sums of money made from engaging in narcotics trafficking activities;

(g)     That when drug traffickers amass large proceeds from the sale of drugs, often the drug traffickers attempt to legitimize these profits.  To accomplish these goals, drug traffickers utilize means, including but not limited to, foreign and domestic banks  and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

(h)    That cocaine is not commonly manufactured within the United States and the State of Missouri. It is common for narcotics traffickers to travel to major distribution centers, such as Los Angeles, California, Houston, Texas, Atlanta, Georgia and Chicago, Illinois to purchase narcotics and/or to arrange for its distribution elsewhere in the United States. After purchasing the narcotics, these narcotics traffickers will transport, or cause to be transported, narcotics to the areas in which they will distribute the narcotics. The methods of transportation they use includes but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers;

(i)    That drug traffickers commonly maintain on their persons and in their residences, addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the trafficking organization.

(j)    That drug traffickers commonly take or cause to be taken photographs of them, their associates, their property and assets, their product and that these traffickers usually maintain these photographs in their possession and in their residences or residences associated with them.

(k)    That narcotics traffickers usually keep near at hand paraphernalia for packaging, cutting, weighing and the distribution of narcotics.   These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

(l)    That I am aware that the Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

## CONCLUSION

40

Based on the forgoing facts, investigators believe there is probable cause that evidence of violations of 21 U.S.C. §§ 841(a)(1) 843(b), 846, and 848, and 18 U.S.C. §§ 924(c) and (j), 1956 and 1957 will be discovered inside the **subject location/storage locker**.

In view of the ongoing nature of the investigation, and the risk of harm to informants, cooperating witnesses, to agents, and to the investigation, which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning this search be sealed until further order of the Court.

## LIST

1.   Illegal drugs and drug paraphernalia;

2.   Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

3.   Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

4.   Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances;

5.   United States Currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

6.   Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

7.   Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere; and

8.   Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.